## BANNING v. HARTMAN FURNITURE & CARPET CO.

### No. 182–D.

District Court, E. D. Illinois.
May 4,.1931.

Cromwell, Greist & Warden, of Chicago, Ill., for plaintiff.

George E. Mueller, of Chicago, Ill., for defendant.

LINDLEY, District Judge.

Plaintiff complains of infringement of patents Nos. 1,680,370, 1,682,492, and 1,682,-778. Defendant, a dealer, admits the sale of the alleged infringing article, a Majestic radio manufactured by Grigsby-Grunow Company, and asserts as defense invalidity and noninfringement.

The first two patents have to do with the power supply unit, and the third with the chassis, of a radio receiver. Patent No. 1,-680,370, hereinafter referred to as 370, is for a combination of elements constituting a power pack for converting an alternating electric current into a constant even flow of direct current to the plate circuits and the filament circuits. The controversy herein, however, is limited to that portion of the device which has to do with the supply of current to the plates, the B supply.

Patent No. 1,682,492 covers a specific arrangement of the choke coils in the power pack disclosed in 370, whereby, it is claimed, an improvement in the filtering action is accomplished.

Originally B batteries were used to supply plate current to radio receivers. The present day receiver requires a comparatively large amount of B current in order to supply a reserve power properly to utilize power tubes and loud speakers. The evidence shows that to supply the potential power of defendant's present device would require twenty batteries, costing $85 and weighing 320 pounds, and that the cost of such battery current would be over $1 an hour, whereas the cost under defendant's device, a power plant of such size and weight as may be easily housed in the cabinet, is approximately one cent per hour. The benefits of replacement of B batteries by such a device are obvious.

The essence of operation of radio receivers lies in the vacuum tube, which comprises three elements within a vacuum, i. e., the cathode or filament, the anode or plate, and the control electrode or grid. The latter is placed in the tube between the filament and the plate. In a simple circuit for such a three-element tube the filament is connected to one battery and the plate and one terminal of the filament to another, the B battery. The current in the plate circuit flows from the positive side of the B battery to the plate, then to the filament and back to the battery. In such a circuit there is provided an amplifier device of current consuming character, which produces a flow of energy in the plate circuit. The current flows in the plate circuit through the space between the cathode and the plate and is produced by the emission of electrons emanating from the filament, which strike the plate and are caused by the heat generated in the filament by the current flowing from the A battery. If the grid, which lies between the plate and the filament, is electrically charged, the flow of electrons and of current into the plate circuit is materially affected. This effect thus produced is directly related to the potential of the grid.

In using a tube in a radio receiver the impulses picked up by the aerial, feeble in character, are thrown upon the grid, and as they vary, the flow of current in the plate circuit varies; such variations of the flow of current in the plate circuit being in direct proportion to the grid charge. It follows that if the plate current from the B battery is constant we have in the amplifier current consuming device or coil thereof a current which varies directly with the variation of the impulses thrown upon the grid. Inasmuch as the plate circuit contains a local source of power, the current therein is much stronger than is that which comes from the aerial into the grid, but will possess the same characteristics. Evidently the grid circuit is properly referred to as the input circuit,. and the plate circuit, which operates the speaker, or furnishes current to amplifying tubes, is proper-

ly referred to as the output circuit of the tube.

The purpose of the receiver is to reproduce in the loud speaker, fed by the plate circuit of the tube, the vibrations which are broadcast from the microphone, changed to electrical energy and thereafter picked up by the receiving antenna and impressed upon the grid circuit. Exact reproduction in the loud speaker necessitates exact reproduction of the impulses received in the input circuit. Consequently, if the plate circuit current is not constant, the current in the current consuming amplifying device or coil will be affected by the fluctuations in the former and the loud speaker will produce not the pure tone that was broadcast, but a tone affected by the fluctuations in the B circuit.

The ordinary source of supply in electrical distributive systems is an alternating current of sixty cycles, in which there is a change of polarity or reversal of current flow sixty times per second. Obviously if alternating current is applied directly to the plate circuit, the result in the amplifier will be completely distorted and useless from the point of view of practical audition.

Batteries furnish a substantially smooth, even, direct current for the B supply, but a direct current produced by a generator, or a rectified alternating current is not entirely smooth but is pulsating with ripples remaining upon one side of the converted alternating current. However, although pulsating, it is termed direct because all the ripples are upon the same side of the current; that is, they do not alternate from positive to negative. These variations of the ordinary rectified alternating current are retained in the reproduced impulses of the amplifier and cause well-nigh as imperfect a reproduction as does alternating current.

Edelman claims to have eliminated these difficulties by his invention set up in the claims quoted in the margin. He takes from the ordinary light socket alternating current which cannot be used for radio purposes, converts it by means of rectifiers to a pulsating direct current, and then smooths out the same by means of a filter consisting of a number of choke coils and condensers, and thereby achieves a satisfactorily pure or constant flow of current. The choke coils are connected in a cascade series arrangement, each succeeding coil receiving current from the preceding one. The filter so acts that the chokes and condensers alternately store and discharge energy so that the current is leveled out. The effect upon the current claimed is similar to that of rapids in a river, whereby the pulsating operating current of the river (at the foot of the rapids) emerges into a calmly flowing stream. The resulting operative current is free of substantial distortion and affords satisfactory reproduction of the original impulses. The claims relied upon are set up in the margin.[1]

Edelman insists also that the magnetic lines of force emanating from the transformers and chokes in the power pack must be suppressed so that they will not affect the grid circuits of the receiver and that his device does so successfully. If the grid circuit picks up any additional electric impulses other than those received from the input circuit, such superimposed impulses will result in distortion in the reproduced tones of the broadcast. Inasmuch as the choke coils and the transformers of the patent consist of iron cores upon which are wound wire, magnetic fields are thereby set up. Edelman inclosed these chokes in a metal case so that the lines of magnetic forces will not be radiated and affect undesirably the grid circuit. He thus suppressed the magnetic fields around the transformers and chokes.

This metallic container, when grounded as specified in the patent, serves also to conduct electrostatic energy to the ground. Otherwise it will accumulate in the power supply and be conducted into the sensitive circuits of the receiver and speaker, thus producing an undesirable hum and preventing satisfactory reproduction.

Edelman disclosed also means for procuring different potentials necessary to the prop-

[1] "1. A radio power supply unit comprising a transformer, means to connect said transformer to a source of alternating current, a plate current supply fed by said transformer, a series cascaded filter connected to said plate current supply and including adjustable series resistances to adjust the output potential thereof and to prevent the sudden discharge of current therefrom, a filament current supply fed by said source of alternating current, and a metallic container for enclosing said plate and filament current supplies and grounded to one of said supplies.

"2. In a radio power supply unit, the combination of a transformer, filament and plate current supplies energized from said transformer, and means for suppressing magnetic lines of force extending from said transformer and associated apparatus, comprising a metallic container for enclosing said transformer and associated apparatus, said container being connected to one of the terminals of the filament current supply.

"3. In a radio power supply unit, the combination of a transformer, a rectifier connected thereto, a filter circuit operatively connected to said rectifier, said filter circuit having a plurality of output terminals, and means for reducing the potential at the terminals of said filter circuit and limiting the rate of discharge of current therefrom, comprising resistances connected between the filter circuit and one or more of the output terminals."

er operation of the different tubes of the receiver. In a multitube receiver, experience teaches that such variety of potentials is essential, for the different tubes require different voltages. Thus in defendant's product we find that on the detector tube 45 to 90 volts are applied to the plate circuit, while in the same circuit of the tubes of first, second, and third radio frequency, and in the tube of first audio frequency a current of 144 volts is applied and in the power tube a plate voltage of 425 volts. Each of these tubes can operate only between definite ranges, which vary with the position. Edelman mentions this fact and describes a means for obtaining these various potentials from the one source of power and describes the same fully. Briefly his means consist of specified resistances of the character necessary to produce the desired result.

The patentee also discloses the necessity of raising the potential voltage of the alternating current to satisfy the requirements of higher voltage operation. He provided as a part of his device a step-up transformer which raises the potential as required.

Thus it will be seen that Edelman designed an electrical combination which furnished satisfactory means for converting alternating current to a direct current, ridding the same of pulsating variations, disturbing to proper reproduction. This he did by use of alternating current, a transformer, rectifying tubes, filter of choke coils and condensers. He prescribed means for supplying different potentials to the tubes of various potentialities and increased the voltage of the original supply of current by a step-up transformer, to the degree necessary to furnish the necessarily higher voltage required in successful operation. Then he provided a shield against electromagnetic disturbances and grounded the same to remove electrostatic interference. By his combination substantially pure, even reproduction free of distortion or humming was made possible at a very low cost, in a very convenient manner. The presumption of validity of his patent is not overcome by the evidence but rather is supported thereby, unless we can say that the teachings of the prior art are such that he did not achieve anything new.

Purschel, No. 1,615,098, describes a method for supplying current to both filament and plates with two sets of rectifiers and filters. The plate potential of all his tubes is the same. The same is true of Dunmore, No. 1,-606,212; Lowell & Dunmore, No. 1,455,141; De Forrest, No. 1,201,272; Warner, British

No. 167,097; the article in Electrical Experimenter, and Aceves, No. 1,622,170. From an examination of Purschel's patent it is clear that the resistances he prescribes are in the filament current supply, and that their function is entirely different from that of Edelman's resistances in the plate current supply. Furthermore, Purschel mentions nothing concerning the suppression of the magnetic fields and makes no provision for grounding to get rid of disturbing electrostatic currents in the reproducing current.

In Lowell & Dunmore patent, No. 1,455,-141, we have a complete radio receiving circuit; but here, too, as we have observed, the plates of the tubes all operate at the same potential. Furthermore, the patentees prescribed a crystal detector in place of the vacuum detector to overcome the effect of the residual hum from the alternating current power supply. Their description and suggestions are of benefit only in connection with operation by the use of a crystal detector, which the evidence shows is impracticable in the modern radio receiver. Nor do the patentees teach the necessity of shielding to protect the current from magnetic disturbances or any ground connection to such shielding. Patentees approached the problem, not from Edelman's point of view, but from that of construction of the receiver circuit. The court is of the opinion that they produced only an inefficient receiver.

De Forrest patent, No. 1,201,272, got his power supply from a direct current source. He makes use of a filter for smoothing out the ripples. But he describes only a one-tube receiver. He furnishes no teaching as to the desirability of eradication of disturbing currents from the magnetic or electrostatic sources. Moreover, under his device it is impossible to make use of a transformer for raising the potential of the current, for no transformer action is possible with a direct current.

Craft patent, No. 1,559,679, did not transform an alternating current but generated a direct current with a motor generator run by an alternating current. The direct current from the generator was then filtered through chokes and condensers. His generator weighed between 50 and 75 pounds and occupied considerable space. It could not be conveniently housed in a desirable cabinet, and unless carefully enclosed and padded would produce mechanical hum. It possessed the objection of great weight, mechanical hum, and sparking of the brushes, which set up electrostatic interference. In addition, he ac-

complished a portion only of the function of the two rectifier tubes of the 370 patent, for there can be no transformer action at the output of the direct current generator. Nor does Craft contain any suggestion as to protection from disturbing electrostatic or electromagnetic forces.

In the Wireless Age of August, 1921, Bront described his method of supplying current for a transmitter. He stated he would try to suggest a possible method of obtaining a high-plate potential and adapt the single source of power to both the filament and plate circuits, and that a successful operation of such a device would greatly interest the average experimenter. The structure he described is apparently inoperative. The tube which he proposes to use is a transmitter tube, which, under the evidence, will require more current than a receiver tube. Furthermore, if a receiver tube were substituted for a transmitter tube, the current required from the power supply would be 1,040 milliamperes. Apparently there is produced no filamentary hot cathode rectifier that would produce such a large output. Defendant's device, for example, consumes a current of only 150 milliamperes, and the Bront device, therefore, if modified by the substitution of a receiving tube for the transmitting tube, would require eight times as much current as all of the plates of defendant's apparatus. From an examination of his article and the testimony it appears that Bront never built any machines; that he was writing concerning experiments; that his device was probably inoperative; and that he did not teach how to build a successful radio power plant.

Hoxie, in patent No. 1,382,914, was endeavoring to prevent current from the plate circuits from feeding back to the grid circuits. Otherwise, he said, the circuit breaks into oscillations and the result is valueless. This idea is not the same as that of building a power pack for supplying current to tubes. Hoxie disclosed no current supply means. He had nothing to do with such supply, for he was dealing merely with the internal works of a receiving set. And apparently Weinberger, in patent No. 1,618,319, was dealing with the same subject matter as Hoxie, i. e., shields to prevent plate current feeding back into the grid circuit and consequent protection from oscillation. Weinberger used batteries for both circuit supplies.

Warner's British patent, No. 167,097, made use of a motor generator. He discloses no means for obtaining various plate potentials; his patent contains no teaching of how by use of a transformer and rectifiers to change alternating current into a direct current and provide the power pack described by Edelman.

In the Electrical Experimenter of July, 1919, White described a single tube receiver. Defendant's expert witness apparently believed this device to be unsatisfactory for operation of a modern radio receiver. White discloses no filter; he discloses no means for obtaining various output potentials for plate current, and although he apparently realized that there would be magnetic lines of force from the transformers, he expressed no appreciation of the desirability of removal of electrostatic energy from the unit.

Levenberg patent, No. 1,670,893, was issued upon an application filed December 8, 1923, two years after the evidence shows Edelman conceived his invention and reduced it to practice. There was some testimony to the effect that a certain company sold certain sets embodying Levenberg's device, but such defense was not pleaded and the device itself was not produced. It was said to be in the courtroom, but the patentees refused to permit the court to receive the same, and there is no blue print or dependable evidence of any character as to the exact nature of the device. I am of the opinion that the proof furnished in no wise anticipates Edelman's conception.

Aceves patent, No. 1,622,170, is similar in many ways to that of Purschel. His plates were all operated at the same potential. He offers no suggestion as to various plate potentials, or about protection from magnetic or electrostatic disturbances. The Patent Office considered Purschel's patent before Edelman's application was allowed.

Farrington patent, No. 1,487,451, was based upon an application filed October 16, 1922. In view of the fact that the court finds that Edelman first perfected his invention by his sketches and building of device as of April 10, 1922, and Farrington's filing date is after that date, the patent is not early enough to amount to prior publication. Farrington was a skilled engineer. He took out the hum current in the radio receiver by using a double set of tubes. The evidence indicates that this delicate arrangement might be operative in the laboratory, but not in practice, and that it was too complicated and required a special type of receiving circuit. Farrington apparently attacked the problem by designing

a delicate receiver circuit instead of attempting to make a current fit for operating by transforming and filtering it separately before use.

The court is·of the opinion that none of the references anticipated the Edelman invention, or were of such character as to invalidate any of the claims mentioned; that the prior art did not teach the solution of the problems which confronted Edelman. It furnishes rather implied support of plaintiff's contention that though there were many working in the field endeavoring to obtain the results that Edelman recognized as desirable and which he obtained, no one of them succeeded.

It is apparent that the delvers in the art were attempting to produce a satisfactory radio receiver fed by alternating current converted into direct current. Some of them made use of motor generators, some of them transformers, but apparently none of them produced a device which accomplished the result sought, viz., a B supply current converted by means of transformers and rectifiers into a direct current; filtered, smoothed from a pulsating direct current into an even, substantially unwaivering current which produced a satisfactory reproduction of the impulses transmitted by the broadcaster, unvaried by oscillations, achieved by the use of various potentials provided for, and protected from electro magnetic and electrostatic disturbances by shielding and grounding. Edelman grappling with the problems confronting the prior art, recognizing the questions confronting his predecessors, attacked the problem from the point of view of taking the alternating current and smoothing it out. The result was a device successful in its operation. He achieved success where others failed. The claims are valid.

In defendant's device the court finds the same means for converting alternating current to a nonpulsating direct current as is described by Edelman. The defendant transforms the alternating current by a transformer, passes it to the rectifier tubes, and then through a filter circuit comprised of a plurality of choke coils and condenser. The transformers convert an alternating current to a direct current, and the filter system smooths it out to a nonpulsating direct current. The defendant likewise achieves a magnetic shield in its box inclosing apparatus, and thereby suppresses the magnetic lines of force radiating from the transformers and chokes and prevents them from creating dis-

tortion. Electrostatic interferences are conducted from the casing to the ground. Though defendant offered some evidence of tests for the purpose of showing that there were magnetic lines of force radiated from the power pack despite the condenser shields, that test was not satisfactory to the court as to the results claimed. Apparently there were some weak magnetic fields at certain points, but when the search coil was moved a few inches away from the pack such fields could not be detected.

Furthermore, in the court's presence the witness making the experiments developed a very emphatically noticeable difference to the court in the volume of sound coming from the loud speaker. The witness, in the face of that fact, said he observed no difference, although another witness for the defendant agreed there was a considerable difference. At the time of this experiment the coil was near the perforations at the bottom of the case. The test was performed in the presence of the court, under the court's direct scrutiny, and the conclusion was inevitable that the case was largely effective in removing electro magnetic impulses.

Furthermore, it is apparent that whether intentionally or not the defendant by its means of assembly achieves grounding of the container. Then, too, the defendant achieves the various plate potentials in the same manner as the patentee. Defendant asserts that it uses two transformers for raising the potential, but the court is of the opinion that infringement cannot be defended upon the ground that instead of using one transformer the defendant has substituted two with the same result. In both the device of Edelman and that of the defendant current is taken from the light plug and fed to the primary of a step-up transformer, and from the secondary of the step-up transformer the current is taken to the anodes of two hot cathode rectifiers. The filaments of these rectifiers are supplied with current from the step-down secondary of the transformer. The current is thus taken from the rectifiers through a filter compromised in each case of choke coils and condensers. Then the current is taken from the choke coils and condensers and through means of resistances is provided at proper potentials for plate circuits to the various tubes. There are no substantial differences in the form of the means used or in the elements. The court is of the opinion that each of the claims of patent 370 sued upon is infringed by the defendant.

The 492 patent covers an improvement upon the device shown in 370. Claims 3 and 4 in suit are presented in the margin.[2]

The novel feature relied upon by plaintiff is the improved filtering effect resulting from the peculiar functioning of the chokes.

Edelman, in describing this, says "a further novel and desirable filtering action is had by mutually coupling with a small percentage of coupling the two choke coils, whereby a slight residual fluctuating current flowing in the one coil choke will tend to be substantially counterbalanced by the oppositely phased induced current set up therein by reason of the small coupling." In claim 4 we have an air gap in the choke coil effecting an increased impedance. Evidently Edelman conceived and teaches a method for securing an increased filtering action by coupling the coils with a comparatively small amount of mutual inductance and by providing air gaps in the closed cores of the choke coils so that effective impedance of the coils as against an alternating current flow is increased, and thereby the current made as nearly smooth, even and direct as possible. We find a pulsating current entering from the rectifier applied to the first choke coil, where it is partially smoothed out, whence it enters the second choke coil so related to the first that a second current is induced from the first coil to the second in opposite phase relationship to the current flowing in the second coil, resulting in the alternating component in the current in the second coil being counterbalanced by the aforesaid oppositely phased induced current from the first coil. A substantially pure direct current results. Edelman points out that the current from the rectifier, a direct current with a superimposed alternating component, which must be eradicated by the filter, is partially smoothed out by the first choke coil. The condenser then by-passes part of the residual hum, that is, the alternating component, and the amount thereof

in the second choke coil is less than that in the first. It is in order to eradicate the remaining alternating current component in the second coil that Edelman induces a small amount of the alternating component in the first coil to the second coil in oppositely phased relationship to the alternating current normally flowing in the second coil. This mutual inductance must be small in amount, for if there is a comparatively large percentage of mutual inductance we will have more of the undesirable alternating current component from the first coil passing to the second than is flowing in the second, so that instead of eradication of the undesirable component we retain all or part of the same from the first coil in the second. Obviously, in such situation there would be no cancelling effect upon the alternating current component. By his device Edelman produced exactly the result desired, and we find nothing in the prior art invalidating his invention.

Houck, in patent No. 1,684,703, does not disclose what Edelman teaches. He says there must be no mutual inductance between the coils, but that mutual inductance must be avoided because it will cause hum and noises in the receiving set. Edelman taught the opposite, i. e., that there must be a small percentage of a coil inductance between the coils to effect the result hereinbefore described.

Johnson, in patent No. 1,613,952, was dealing with carrier wave telephony, and described a device intended to permit alternating current of certain frequencies to pass, and to cut out other bands of frequencies, so that several different conversations could be carried on over the same wire at the same time in the respective different bands of frequencies. He did not endeavor to suppress all of the alternating current frequencies, but told us how different bands could be set up over the same carrier, and the emanations made practicable by differently tuned demodulators. He had in mind a circuit properly tuned in a particular resonance in order to pass certain frequencies, and to accomplish this he made use of induction means described in his patent. The evidence discloses rather clearly that such impedance would defeat the operation of a filter such as is used in the radio receiver of Edelman, for after the alternating current compound has left the first choke coil of plaintiff a large percentage of it must be by-passed through the condenser connected between the choke coils, and if the choke coil should be connected ahead of the condenser the effect would be to prevent the function of the condenser. The

[2] "3. In a radio battery eliminator, a filter circuit including two choke coils having separate cores so placed that the mutual coupling between said coils causes ripple current flowing in one of said coils to be substantially opposed by electromagnetically induced ripple current supplied by the other of said two coils, and a by-pass condenser connected at the junction of said two coils.

"4. In a radio battery eliminator, a filter circuit comprised by two choke coils one of which has a core with relatively small air gap while the other has a separate core including a plurality of distributed air gaps therein, a by-pass condenser, connected to the junction of said two coils, means to couple said two coils with a low percentage of mutual coupling sufficient to induce some ripple current from one of said coils into the other to oppose the flow of residual ripple current flowing in said other coil."

two patentees were attacking different problems and attained different results.

The Johnson and Shea Article and the Campbell Article deal with the same subject-matter and the same problems as Johnson's patent.

Engel patent, No. 1,732,041, cited as proof of the state of the art, prescribed three separate power packs, one each for the filaments, the plate, and the negative grid bias potential. In each he used electrolytic rectifiers, to each of which was connected a filter circuit, containing in each instance one choke coil. Manifestly it was not possible in any such single circuit to attain the relationship between the two coils disclosed by Edelman.

The Radio Article of 1925 discloses no construction for inducing current from one choke into another, although that article, as well as the Engel patent, both disclose an air gap in the choke coil.

None of the prior art delvers were concerned with exactly the same problem as Edelman or anticipated him.

Bearing upon the question of whether or not defendant infringed the claims of 492, certain oscillograph tests were explained in open court. There were likewise certain ear phone tests conducted in which the court participated. The oscillograph tests were made by placing the testing instrument across the output of the power pack and operating the device first in the normal position and defined by the defendant's expert as in opposition, being the condition when the receiver is sold. In the second test the coil of one choke was reversed with respect to the other. The result showed less ripple or alternating current component when the coils are in the normal position, i. e., as sold, than when they are reversed. The ear test disclosed that when the coils were in normal position there was much less alternating current component heard than when in reverse. The construction of the defendant is equivalent to that of the plaintiff and infringement results.

Though the use of air gaps and choke coils was recognized prior to the invention of Edelman, yet the latter's combination including such was not anticipated by any of the prior art, and the inclusion of such old element as part of his working combination, resulting in the solution of his problems, does not invalidate the same.

The Chassis patent, No. 1,682,778, discloses a unitary radio chassis for the mounting of a complete radio receiver set including the power plant. Edelman accomplished a desirable result in the form of a convenient and attractive casing, but the court is unable to appreciate any element of invention in this design. There were prior patents for a radio chassis, but the court is not convinced that in any of them was invention achieved. An examination of the prior art as well as of the patent in suit is convincing to the effect that when Edelman came to develop a chassis or casing for the mounting of a radio receiving set he was confronted with the ordinary mechanic's problem, and that what he did amounted merely to the exercise of ordinary mechanical skill. The court is of the opinion that the patent and each claim thereof are invalid for want of invention.

There will be a decree in accordance with this opinion finding the claims in suit upon patents 370 and 492 valid and infringed, and the chassis patent invalid, and for an accounting as to the first two patents mentioned. The costs of the suit shall be taxed two-thirds against the defendant and one-third against the plaintiff.