## IRON FIREMAN MFG. CO. v. INDUSTRIAL ENGINEERING CORPORATION.

### No. 1782.

District Court, S. D. Indiana, Indianapolis.

March 21, 1936.

Henry H. Snelling, of Washington, D. C., and Craig & Craig, of Evansville, Ind., for plaintiff.

Emery, Booth, Holcombe & Miller, of Washington, D. C., and Milford M. Miller and Wm. C. Welborn, both of Evansville, Ind., for defendant.

LINDLEY, District Judge.

Plaintiff, owner of patent to Garrison, No. 1,386,698, and another to Banfield, No. 1,778,349, sues for infringement. Plaintiff is a manufacturer of completely automatic stoker equipment for heating furnaces, and defendant sells control units intended to be placed on stokers of other make with the result that, when equipped with such control unit, they will perform the functions of and compete with the product of plaintiff. Defendant insists that the patents are invalid, but, if valid, not infringed.

996

The Garrison patent was granted August 9, 1921, on an application filed March 15, 1920. The claims in suit are one and three, which appear in the margin.[1] Of the elements named in claim 1 the "furnace of mechanical fuel feed," "means of connecting said fuel feed to the furnace," "a control apparatus adapted to open and close the draft of the furnace and start and stop the fuel feed" and "a thermostat adapted to control the operation of said furnace and fuel feed" for normal operations, "according to the temperature requirements," were all old in the art. Garrison was not in this patent the originator of the idea of feeding the coal or the first to provide a time device for heating systems. The broad idea of thermostatic control of stokers through a control apparatus is the subject matter of a prior patent to him, No. 1,382,877. To these old elements, Garrison added "a time device adapted to operate the furnace and fuel feed for a definite time periodically, irrespective of temperature requirements." Thus the claim must be construed as one for a combination of elements adapted to operate periodically a stoker and the drafts of an automatic furnace, controlled by a thermostat, to produce heat in accordance with a predetermined standard with an alleged novel addition of a timing device which will apply electric current which in turn opens the draft and starts the stoker, independent of temperature requirements, at stated predetermined intervals, so that the fire will not die.

Timing devices for opening and closing switches controlling electric currents at stated intervals are old in electrical art, and the question submitted is whether by the addition of such a device a patentable combination was created. The timing device, according to the patent, has only one function to perform; at stated intervals it closes the switch and thereby starts the furnace so that the fire will not die. The disclosure teaches no other function. The timing device does not shut off the current, but that result, on the contrary, is accomplished by the thermostat controlling the room temperature. In other words, the clock merely starts the motor which controls the stoker and drafts, but does not stop it. This operation, thus started at stated intervals, is not ended until the room thermostat stops the motor when the desired room temperature, which controls the thermostat, has been reached.

In claim 3 we have the same old elements, including, however, an alleged new element, "a time device adapted to so operate the electrical device that the furnace and fuel feed are operated for a definite time periodically irrespective of the temperature requirements and which time device is also adapted to so change the thermostat connections that said electrical device is controlled by the thermostat according to the temperature requirements at all times other than said definite periodical times." However, an examination of the specifications and descriptions disclose that the device claimed does not, as indicated, stop the fuel feed. It merely starts it. In other words, under this claim also, the time device merely controls one cycle of operation of the electrical device to start the motor, and also changes the thermostat connection all without stopping the motor. The latter is thereafter subject only to the control of the thermostat. Though the claim is more specific than claim 1, it is built up in the same fashion, by a union of old elements, all of which continue to perform individual functions well known to the art.

[1] Claim 1. The combination, with a furnace, of a mechanical fuel feed, means of connecting said fuel feed to the furnace, a control apparatus adapted to open and close the drafts of the furnace and start and stop the fuel feed, a time device adapted to operate said furnace and fuel feed for a definite time periodically irrespective of temperature requirements, and a thermostat adapted to control the operation of said furnace and fuel feed at all other times according to the temperature requirements.

Claim 3. In combination: A thermostat located at some point at which it is desired to regulate the temperature of the air; a furnace for the purpose of supplying heat to the point at which the thermostat is located; a mechanical device for feeding fuel to the furnace; an electrical device adapted to open and close the drafts of the furnace and start and stop the mechanical fuel feed; a time device adapted to so operate said electrical device that the furnace and fuel feed are operated for a definite time periodically irrespective of the temperature requirements, and which time device is also adapted to so change the thermostat connections that said electrical device is controlled by the thermostat according to the temperature requirements at all times other than said definite periodical times.

I am of the opinion that each of these claims is invalid for want of invention; that they constitute aggregations. At the risk of repetition, I call attention to established principles upon this subject-matter in order that the reasons for my conclusions may be clear. Mr. Justice Matthews, in Pickering v. McCullough, 104 U.S. 310, 318, 26 L.Ed. 749, said, a long time ago: "In a patentable combination of old elements, all the constituents must so enter into it as that each qualifies every other; to draw an illustration from another branch of the law, they must be joint tenants of the domain of the invention, seized each of every part, per my et per tout, and not mere tenants in common, with separate interests and estates. It must form either a new machine of a distinct character and function, or produce a result due to the joint and co-operating action of all the elements, and which is not the mere adding together of separate contributions." In endeavoring to follow this opinion, the Circuit Court of Appeals for the Third Circuit, in National Cash-Register Co. v. American Cash-Register Co., 53 F. 367, 371, said: "A combination, to be patentable, must produce a new and useful result, as the product of the combination, and not a mere aggregate of several results, each the complete result of one of the combined elements."

■ It is not necessary, of course, that the several elemental parts of a combination should act simultaneously, but it is necessary that the parts be so arranged that the successive action of each contribute to produce some one practical result, which, when attained, is the product of the simultaneous or successive action of all of the elemental parts, viewed as one entire whole. The union is a mere aggregation unless the elements by their united action perform some function which they do not separately discharge. Combined Patents Can Co. v. Lloyd (C.C.) 11 F. 153. There must be co-operation of the parts in producing a new result, and this must be co-operation united to a common and unitary result. Hoffman v. Young (C.C.) 2 F. 74. The elements must have reciprocal influence on each other so that their joint action produces a common object which brings about new additional functions and accomplishes additional results. Here the time device added for the closing of the switch at fixed intervals and performing no additional function merely accomplishes

its original individual result and when added to an old combination, does not bring about invention. It does not co-operate with other elements. It contributes to no joint action. There is no co-operation or coalescence of its efforts or actions with those of the other elements. It is merely the insertion of a well-known means for closing an electrical switch at stated intervals.

I believe the present claims come within the criticism of the Circuit Court of Appeals, in Hartman Furniture & Carpet Co. v. Banning, 59 F.(2d) 129, 131, where Judge Evans said: "Bringing old devices into juxtaposition and allowing each to work out its own effect without the production of something novel is not invention. Bringing together several old devices without producing a new and useful result, which is the joint product of the elements of the combination and something more than the aggregation of the old results, is not invention. * * * Co-action it is true may result from the excision, as well as the addition, of a factor. In either case, however, the action of the element must affect another element of the combination described. It must coact with another element. If it acts separately—performs its functions separately and apart from the other elements—it adds nothing to the combination as such."

■ I am further convinced that under the reasoning of the Circuit Court of Appeals in the case last cited, any asserted attribute of invention in the addition of the timing device to an automatic stoking outfit "is successfully met by the argument that such" addition "was an obvious and old device which any electrician would adapt."

I am further of the opinion that if the Garrison claims are to be construed as covering such device as those marketed by defendant, then they are broader than Garrison intended, involving claims for functions, and, are therefore, void on that ground.

■ Banfield, No. 1,778,349, issued October 14, 1930, is based upon claims for an improvement over Garrison by adding still another element to the latter's aggregation, a furnace or boiler thermostat. He claims to have improved the operation in comfort and economy. In other words, he added a thermostat to the furnace, or rather the boiler, in addition to the room thermostat. These two thermostats, it is

contended, are always in electrical series. Claims 1 and 2 are relied upon and appear in the margin.[2] The "means for periodically closing the motor circuit" is the old time device utilized in Garrison. Its function is merely to close the motor circuit at certain fixed times, governed by the timing device, a clock. Here, too, when the motor circuit is once closed, it remains closed without further action from the timing device. But Banfield added a second thermostat, and his claim, therefore, includes "two spaced thermostats, adapted to close the motor circuit independently of" the timing device. The purpose of the second thermostat, of course, was to make the heating more even by using two thermostats instead of one, one governed by the room temperature and the other by the temperature of the water in the boiler. The furnace thermostat shuts off the electric current when the water temperature reaches a certain fixed point. The room thermostat shuts off the current when the room temperature reaches a certain fixed point, and again applies the current, opening up the furnace, when the room temperature falls below a fixed point. The furnace thermostat controls the opening and closing of currents, but the action thereof was old in the art, and I am unable to see that the addition of the furnace control thermostat produced any new coaction, joint action or coalescence of functions even though the two thermostats are placed in series. To use two thermostats, each one of which performs its own function was not invention. The Patent Office allowed claim 1 upon Banfield's assertion that the claim was valid over Gray, No. 1,667,001, who used one thermostat because he, Banfield, used two, but I am of the opinion that again mere aggregation was involved.

Claim 2 somewhat more specifically asserts that the room thermostat and boiler thermostat shall be in series "to continue the feeding of fuel and air to the furnace after the close of the fuel feeding period when the heat requirements have not been met." His specifications and drawings do not indicate the utilization of any such action, because, under his construction, the fuel feeding periods will not end until heat requirements have been met and the thermostats so act as to stop the motor, for no cycle of periodic stoker operation initiated by the time device is concluded until heating requirements have been met. Claim 2, therefore, adds nothing to claim 1 and is invalid as constituting mere aggregation. The prior art is exemplified by the earlier Garrison patent. St. Clair, No. 1,633,465, Gray, No. 1,667,001, Smith No. 1,600,568, and Johnson, No. 1,602,363, disclose a state of the art such as to teach a skilled workman in electricity to do everything that Banfield did.

Each of the claims being invalid, there will be a decree dismissing the bill for want of equity. Proper form may be submitted.

---

[2] Claim 1. In a furnace; a motor driven stoker, means for periodically closing the motor circuit, and two spaced thermostats adapted to close the motor circuit independently of said means.

Claim 2. In combination: A furnace, a stoker, time controlled means for operating the stoker to supply fuel and air to the furnace for definite periods of time at chosen intervals and irrespective of temperature requirements, a room thermostat, a furnace thermostat, and means connecting the room thermostat, and boiler thermostat in series to continue the feeding of fuel and air to the furnace after the close of the fuel feeding period when the heat requirements have not been met.